# In the United States Court of Federal Claims

No. 21-1647C
Filed: September 30, 2021
Reissued: October 15, 2021[†]
Corrected: November 10, 2021[‡]

---

**ACCELGOV, LLC,**

        *Plaintiff,*

**v.**

**THE UNITED STATES,**

        *Defendant,*

**and**

**UNITED SUPPORT SERVICES, INC.,**

        *Intervenor-Defendant.*

---

*W. Brad English*, *Jon D. Levin*, *Emily J. Chancey*, *Joshua B. Duvall*, and *Nicholas P. Greer*, Maynard, Cooper & Gale, P.C., Huntsville, Alabama, for Plaintiff.

*Catherine M. Parnell*, Trial Attorney*, Douglas K. Mickle*, Assistant Director, *Martin F. Hockey, Jr.*, Acting Director, Commercial Litigation Branch, *Brian M. Boynton*, Acting Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., with *John McHugh*, Office of General Counsel for the U.S. Marine Corps, of counsel, and *William Gery*, Small Business Administration, Of Counsel, for Defendant.

*Richard B Oliver*, *J. Matthew Carter*, *Meghan D. Doherty*, and *Dinesh C. Dharmadasa,* Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, California, for Intervenor-Defendant.

---

[†] This Opinion was filed under seal. On October 14, 2021 the parties filed a joint notice proposing redactions of protected information. (ECF No. 62). This public version reflects those redactions.

[‡] Deleting a repeated word on page 17.

## <u>MEMORANDUM OPINION AND ORDER</u>

**TAPP, Judge.**

AccelGov, LLC ("AccelGov") brings this pre-award protest to challenge the United States Marine Corps' ("USMC") award of a sole-source bridge contract to United Support Services, Inc. The case presents three core issues. The first is whether the Marine Corps "expressed publicly a clear intent to award" a small business set-aside contract. The second is whether the bridge contract is a "new requirement" requiring the Small Business Administration ("SBA") to perform an adverse impact analysis. The third issue is whether the Marine Corps' selection process itself was arbitrary and capricious.

The Court finds that the clear disclaimer in the sources sought notice controls, and that notice does not demonstrate a clearly expressed public intent to conduct a procurement. The Court also finds that the bridge contract was not a new requirement, therefore, the SBA was required to perform an adverse impact analysis. It failed to do so. Accordingly, the Court remands this matter to the SBA to perform an adverse impact analysis as required by 13 C.F.R. § 124.504. Finally, the Court finds that the Marine Corps is entitled to discretion in the procurement process, and its selection of United Support Services was not irrational, arbitrary, or capricious.

Accordingly, the Court **DENIES** AccelGov's Motion for Judgment on the Administrative Record with respect to Counts I and III. The Court **GRANTS** the United States' and United Support Services' cross-motions for judgment on the Administrative Record with respect to Counts I and III. The Court **REMANDS** Count II for further consideration by the SBA consistent with this opinion.

### I.    Background

AccelGov's challenge avers that the Marine Corps' decision to utilize the Small Business Act's Section 8(a) Business Development Program to award the bridge contract was irrational, arbitrary, capricious, and contrary to law. AccelGov raises three primary arguments: (1) the Marine Corps could not have lawfully utilized the 8(a) Program because the Marine Corps expressed a prior intent to award the bridge contract as a small business set-aside; (2) the bridge contract requirements were not "new" and therefore, even if an 8(a) Program award was lawful, the SBA was first required to perform an adverse impact analysis, but it did not do so; and (3) in evaluating whether United Support Services was "suitable" and "eligible" for an 8(a) Program award, the Marine Corps acted arbitrarily and capriciously. Before diving into the merits of AccelGov's arguments, it is necessary to explain why the bridge contract was necessary in the first place.

To explain how AccelGov fits into this narrative, it is important to know that AccelGov is a mentor-protégé joint venture between AgovX, LLC and 22nd Century Technologies ("22nd Century"). (Am. Compl. ¶ 5, ECF No. 28). In March 2016, the Marine Corps awarded task order N0017811D6410-MU61 (the "Incumbent Contract") to 22nd Century. (Administrative Record

("AR") at 3, ECF No. 24).[1] The Incumbent Contract was an information technology ("IT") support services contract for the Marine Corps' Facilities Services Branch primarily performed at a Marine Corps installation in Kansas City, Missouri. (AR 2). That installation supports several IT systems, including the Marine Corps' Food Management Information System, CLWATER, USMCmax, and GEOFidelis. (AR 8). These systems support services such as menu preparations for Marine Corps installations across the United States, notifications to individuals who may be affected by contaminated water at Camp Lejune in North Carolina, facility maintenance operations at installations worldwide, and public utilities monitoring operations. (Decl. of R. Thompson at 5–6, ECF No. 33-2). The Marine Corps designated the Incumbent Contract as a set-aside for small businesses. (Am. Compl. at ¶ 8). The Incumbent Contract contained a period of performance from March 2016 through January 19, 2021 and was valued at approximately $39 million. (AR 3). Under FAR § 52.217-8, the Marine Corps exercised its option to extend that period to July 19, 2021.

In October 2020, needing to prepare for the Incumbent Contract's expiration, the Marine Corps issued Solicitation No. M95494-21R-3000 (the "RFP") to procure follow-on IT services. (AR 3, 12, 13, 480). The RFP was designated as a 100% small business set-aside contract with a performance period of five years (inclusive of options) and a total value of approximately $37 million. (AR 12, 13, 23, 477). 22nd Century asserts that as of October 2020, it could no longer certify as a small business and thus was ineligible to bid as a prime contractor. (Am. Compl. ¶ 10). Instead, FreeAlliance.com, LLC ("FreeAlliance") responded to the RFP and proposed 22nd Century as a subcontractor. (AR 478; Compl. Ex. A at A10, ECF No. 1-2).

The Marine Corps reviewed eighteen offers in two phases. (AR 114, 478). In Phase I, the Marine Corps evaluated proposals' adherence to the RFP's submission instructions; non-compliant proposals were eliminated. (AR 114). In Phase II, the Marine Corps evaluated offers based on a ranked five-factor best value tradeoff. (AR 114–15). FreeAlliance was eliminated in Phase I for submitting a proposal that exceeded the RFP's page limits. (AR 490–91). The Marine Corps awarded the follow-on contract to Arrowpoint Corporation ("Arrowpoint") in June 2021.[2] (AR 477). In early July, the Marine Corps debriefed the unsuccessful offerors. (AR 1204). After that debriefing, on July 9, the Contracting Officer notified the Marine Corps Systems Command that the award to Arrowpoint was likely to face protests. (AR 1203–04). Several days later, Marine Corps Systems Command informed the Contracting Officer that it had already exercised its extension options under FAR § 52.217-8 and no further extensions were available. (AR 1203). This was concerning to the Marine Corps, as the Incumbent Contract was scheduled to expire on July 19.

On or about July 15, United Support Services, FreeAlliance, and one other unsuccessful

---

[1] The Administrative Record in this case spans several docket entries, but the Court will simply refer to the Record by its consecutive pagination in the bottom righthand corner. The bulk of the record can be found at ECF No. 24. (AR 1–877). Some documents can be found in ECF No. 43-1. (AR 878–1201). Finally, some documents were produced pursuant to the Court's Order Granting AccelGov's Motion to Complete. (ECF No. 46–1 containing AR 1202–1211).

[2] All dates hereinafter refer to the year 2021 unless otherwise noted.

offeror filed protests of the RFP with the Government Accountability Office ("GAO"), thereby triggering a statutory 90-day stay of performance and a stop work order from the Marine Corps. (AR 692, 787, 563, 674). The next day, the Contracting Officer notified several companies—including 22nd Century—of the protest, the stop work order, and most importantly, that the Marine Corp would be issuing a Request for Information regarding the services procured through the RFP. (AR 562–63). The following day, July 17, United Support Services notified the Contracting Officer that it was eligible for an 8(a) sole-source award and capable of responding to a sole-source RFP within 24 hours. (AR 1209).

On July 19, the Contracting Officer distributed Sources Sought Notice No. M95494-MR21-20 (the "RFI") to six companies, including 22nd Century, Arrowpoint, and United Support Services (but not FreeAlliance or AccelGov). (AR 572, 562, 564, 566, 568, 571). The RFI explicitly stated that it was intended for informational purposes only, not a commitment to make a contract award:

> This Sources Sought is for informational purposes only. This is not a Request for Proposal. It does not constitute a solicitation and shall not be construed as a commitment by the Government. Responses in any form are not offers and the Government is under no obligation to award a contract as a result of this announcement. No funds are available to pay for preparation of responses to this announcement. Any information submitted by respondents to this notice is strictly voluntary.

(AR 572 (capitalization altered)). The RFI also stated that "[t]he Government anticipates awarding a . . . Bridge Contract to support" the Marine Corps installation in Kansas City, Missouri. (AR 572). The RFI anticipated a one-month base period with three one-month option periods. (*Id.*).

Six companies responded: (1) 22nd Century; (2) AccelGov; (3) Arrowpoint; (4) FreeAlliance; (5) LinTech Global, Inc.; and (6) United Support Services. (AR 640, 646, 650, 657, 662, 668). In a memorandum to the file, dated July 22, the Contracting Officer noted that based on his review of the six responses, "more than one source is available to meet the requirements of the bridge contract and therefore the USMC cannot meet the exception for full and open competition at FAR 6.302-1, only one responsible source." (AR 674–75).

On July 21, after business hours, 22nd Century and FreeAlliance each filed complaints challenging the anticipated sole-source award (though one had not been *publicly* announced). (Case Nos. 21-1598 & 21-1599). On July 23, the SBA sent the Contracting Officer an "SBA 8(a) Search letter" regarding the contemplated four-month bridge contract. (AR 676–77, 1205). Notably, in that letter, three times the SBA identified the contemplated four-month bridge contract as a "follow-on" to the Incumbent Contract. (AR 677).

On July 27, the Contracting Officer notified the six firms who responded to the RFI that the Marine Corps had determined "not to proceed with making an award based upon the requirements as stated within the [RFI]." (AR 679–91). That same day, the Contracting Officer requested authorization to issue a bridge contract award to United Support Services consisting of a six-month base period, a three-month option period, and a thirty-day option period. (AR 692).

The Marine Corps valued the bridge contract at approximately $3.5 million. (AR 692). The Contracting Officer sought agency approval to issue the bridge contract award as a sole-source award through the 8(a) Program. (AR 698–700). That request explained that four 8(a)-eligible companies expressed interest by submitting offers in response to the October 2020 RFP and only one—United Support Services—submitted a proposal that was evaluated as part of Phase II. (AR 699). Additionally, the Contracting Officer submitted a memorandum to the file dated July 27 documenting his decision to make a sole-source award under the 8(a) Program. (AR 770). The Contracting Officer further informed United Support Services' SBA representative that the Marine Corps would offer United Support Services a sole-source award of the bridge contract pending approval of the Contracting Officer's request for authorization. (AR 695–96). On July 30, via email, the Marine Corps sent United Support Services a letter titled "Request for Proposals Under Contract M95494-21-C-0025" which enclosed a draft contract for the IT support services bridge contract. (AR 878).

AccelGov filed this protest on August 2 and simultaneously moved for a preliminary injunction to prevent a sole-source award. (Compl, ECF No. 1; Mot. for PI, ECF No. 3). That same day, the Contracting Officer drafted a second memorandum to the file—styled as an addendum—further explaining the Marine Corps' selection of United Support Services for an 8(a) sole-source award. (AR 874). The Contracting Officer stated that the award qualified for the 8(a) Program because the contract was valued at less than $4.5 million. (AR 874 (citing 13 CFR § 124.506(a)). The Contracting Officer explained that in reviewing known 8(a) companies in the market, the Marine Corps "focused" on three factors, including whether companies: (1) had "the technical capabilities to execute the requirement immediately;" (2) an accounting system "approved for a cost reimbursable contract" paired with "fair and reasonable" pricing; and (3) whether "[t]he 8(a) company is a responsible Offeror in accordance with [48 C.F.R. § 19.800 *et seq*.]." (AR 874). In identifying the known 8(a) companies that performed the type of work sought, the Contracting Officer noted AccelGov did not submit a proposal in response to the RFP and FreeAlliance's proposal was deemed "unacceptable" in Phase I and thus was not evaluated in Phase II. (AR 874–75). The Contracting Officer then considered each company relative to the three factors identified—technical capability, cost/price, and responsibility. (AR 875–76).

In considering AccelGov, the Contracting Officer "relied on the four (4) page RFI response[,]" which he deemed technically acceptable. (AR 875). However, the Contracting Officer caveated that AccelGov's response "did not contain a wealth of information on which the [Marine Corps] could determine that [AccelGov] would be able" to execute the requirement "with no worse than moderate performance risk." (*Id.*). The Contracting Officer added that while it lacked familiarity with AccelGov's teaming arrangement involving 22nd Century, its unfamiliarity "did not have an overall impact on the [Marine Corps'] technical assessment." (AR 875).[3] With respect to the cost/price factor, the Contracting Officer stated that AccelGov "did not

---

[3] AccelGov takes issue with the credibility of this assertion. (Pl.'s MJAR at 11–12, ECF No. 47). The Court is sympathetic—AccelGov identified by name the 22nd Century employees who would perform the required work. (AR 648). Additionally, 22nd Century had been performing the required work for five years at the facility in question which, lest the Marine Corps forget,

address whether it [had] an approved accounting system, which is a requirement for a cost reimbursement contract." (AR 875).

In considering FreeAlliance's technical capabilities, the Contracting Officer stated that the Marine Corps "would have to evaluate the technical proposal volume submitted in response to [the RFP,]" but did not have the time or personnel to conduct that evaluation under the circumstances. (AR 875–76). Similarly, the Contracting Officer stated that while FreeAlliance utilized an accounting system approved by the Defense Contract Audit Agency, the Marine Corps did not have the time and resources to evaluate FreeAlliance's price reasonableness. (AR 876).

The Contracting Officer evaluated United Support Services' RFP response finding it acceptable in Phase I and "acceptable" or better for all four Phase II non-price factors. (AR 876). The Marine Corps also looked to United Support Services' RFI response, finding the company capable of beginning performance within five days. (AR 876). The Contracting Officer further found that ███████████████████████████████████████. (AR 876). Finally, with respect to responsibility, the Contacting Officer noted that the SBA had endorsed United Support Services for an 8(a) Program award of the bridge contract. (AR 876).

The United States filed the Administrative Record on Friday, August 6. On August 8, armed with the agency's record, AccelGov renewed its motion for preliminary injunctive relief and also sought a temporary restraining order ("TRO"). (Mot. for TRO, ECF No. 29). The Marine Corps awarded the bridge contract to United Support Services on August 9. (AR 1117). The Court denied AccelGov's motions, citing credible national security concerns that weighed against an injunction. *AccelGov, LLC v. United States*, No. 21-1647C, __ Fed. Cl. ___, 2021 WL 3578694 (Aug. 13, 2021). The Court's decision explicitly did not address the merits of AccelGov's claims. *Id*. The parties have filed cross-motions for judgment on the administrative record and the Court has heard oral argument. This matter is now fully briefed and ripe for a decision on the merits.

## II.    Analysis

Where, as here, the parties have filed cross-motions for judgment on the administrative record, RCFC 52.1 provides a procedure for parties to seek the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). Unlike summary judgment standards, genuine issues of material fact do not preclude a judgment on the administrative record. *Id*. at 1355–56. Questions of fact are resolved by reference to the administrative record. *Id*. at 1356.

As previewed above, AccelGov challenges the Marine Corps' decision to make an 8(a) sole-source award. (Pl.'s MJAR at 12, 14, ECF No. 47). AccelGov seeks an order declaring the sole-source award unlawful and ordering that the Marine Corps be permanently enjoined from

---

AccelGov, FreeAlliance, and 22nd Century all noted in their responses to the RFI. (AR 642, 646, 658). This statement is disturbing as it appears aimed at disadvantaging 22nd Century and its business associates.

allowing performance under the award. (*Id*. at 31). When presented with a challenge to a procurement award, "[t]he task of the reviewing court is to apply the appropriate [Administrative Procedure Act] standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985); 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706 (the "APA")).

Under the APA standard, "[i]n a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). Thus, judicial review of agency action under the APA proceeds on two tracks: (1) the Court might find that the agency's decision lacked either a rational basis or support from the administrative record or was arbitrary and capricious; and/or (2) the Court could find the agency's procurement procedure involved a regulatory or statutory violation. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009). To obtain relief, even if the protestor shows that the procuring agency violated the law, it must also show that the agency's violation was prejudicial to the protestor. *Glenn Def. Marine*, 720 F.3d at 907; *see also Veterans4You LLC v. United States*, 985 F.3d 850, 857 (Fed. Cir. 2021). In reviewing sole-source awards, the same APA standard of review applies. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001) ("Identical review standards apply under the APA in the context of a sole-source award.").

AccelGov first argues that the award was contrary to 13 C.F.R. § 124.504(a) because the Marine Corps previously expressed clear public intent to award the requirements as small business set-aside. (Am. Compl. ¶¶ 29–34 (Count I); Pl.'s MJAR at 14–19). Second, AccelGov contends that the SBA failed to perform an adverse impact analysis required by 13 C.F.R. § 124.504(c). (Am. Compl. ¶¶ 35–41 (Count II); Pl.'s MJAR at 19–22). Third, AccelGov alleges that the Marine Corps failed to evaluate offerors' capabilities consistent with the Competition in Contracting Act ("CICA") as it applies to defense agencies. (Am. Compl. ¶¶ 41–52 (Count III); Pl.'s MJAR at 22–25 (citing 10 U.S.C. § 2304(a)(1)(A)). The Court will address each argument in turn.

> A. *The Marine Corps did not publicly express clear intent to award the bridge contract requirements as a small business set-aside.*

AccelGov argues that the Marine Corps' requirements here are ineligible for the 8(a) Program because the Marine Corps publicly demonstrated prior intent to award those requirements as a small business set-aside. (Am. Compl. Count I; Pl.'s MJAR at 14). AccelGov points to 13 C.F.R. § 124.504, entitled in part, "What circumstances limit SBA's ability to accept a procurement for award as an 8(a) contract[?]" That regulation states that the "SBA will not accept a procurement for award as an 8(a) contract" if the "procuring activity issued a solicitation for or otherwise expressed publicly a clear intent to award the contract as a small business set-aside[.]" § 124.504(a). AccelGov argues that the RFI combined with the Marine Corps' internal communications and deliberations demonstrate that clear public intent, making an 8(a) award unavailable. (Pl.'s MJAR at 15). AccelGov further argues that the Marine Corps

used a NAICS Code[4] in the RFI to limit its scope to a single responsible offeror. (*Id*.). AccelGov urges the Court to compare the RFI to the 8(a) Notice of Award and find that the instruments contain the exact same requirements. (*Id*. at 17).

In response, the United States points out that the Marine Corps knows how to express clear intent to award a procurement as a small business set-aside, as demonstrated by the language of the RFP. (USA xMJAR at 15, ECF No. 51). The United States argues that not only did the RFI explicitly state the Marine Corps did not intend to award a contract, but also that the FAR prohibits the use of RFI responses to form a contract. (*Id*. (citing 48 C.F.R. § 15.201(e) ("RFIs may be used when the Government does not presently intend to award a contract, . . .. Responses to these notices are not offers and cannot be accepted by the Government to form a binding contract."))).

The Court agrees with the United States. The FAR identifies several purposes of RFIs. First, contracting activities may use them to "obtain price, delivery, other market information, or capabilities for planning purposes." § 15.201(e). Second, RFIs promote "early exchanges of information about future acquisitions." § 15.201(c). The benefits of this exchange are multifaceted; an RFI may:

> [I]dentify and resolve concerns regarding the acquisition strategy, including proposed contract type, terms and conditions, and acquisition planning schedules; the feasibility of the requirement, including performance requirements, statements of work, and data requirements; the suitability of the proposal instructions and evaluation criteria, including the approach for assessing past performance information; the availability of reference documents; and any other industry concerns or questions.

48 C.F.R. § 15.201(c).

In this case, the record reflects that the Marine Corps used the RFI for those information-gathering purposes. The Marine Corps issued the RFI with clear instructions:

> This Sources Sought is for informational purposes only. This is not a Request for Proposal. It does not constitute a solicitation and shall not be construed as a commitment by the Government. Responses in any form are not offers and the Government is under no obligation to award a contract as a result of this announcement. No funds are available to pay for preparation of responses to this announcement. Any information submitted by respondents to this notice is strictly voluntary.

---

[4] The North American Industry Classification System ("NAICS") was developed by the Office of Management and Budget and is the standard used by federal statistical agencies in classifying business establishments to collect, analyze, and publish statistical data related to the United States' economy. *North American Industry Classification System*, U.S. CENSUS BUREAU, https://www.census.gov/naics/ (last accessed November 10, 2021).

(AR 572 (capitalization altered)). This plain language clearly communicated that the Marine Corps was only seeking to gather information, and responding parties should not try to read between the lines in other parts of the notice.

It is true that the RFI indicated that the Marine Corps was only seeking information from businesses with a standard size of $16.5 million under NAICS code 541330 – Engineering Services. (AR 572). The response instructions directed parties to indicate whether their business fit within that code. (AR 573). But these limitations are still part of the information-gathering function of the RFI. In this context, agencies are not limited to what types of information they can seek using an RFI—the agency can instruct parties to respond with whatever information the agency desires.

In *SKC, LLC v. United States*, 136 Fed. Cl. 605 (2018), the court emphasized that a disclaimer such as the one the Marine Corps included in the RFI, when publicly available to the parties, controls as to the government's expression of intent. In that case, the protestor argued that the agency distributed detailed documents at an industry day event signaling the agency intended to make a contract award for the requirements described. *Id*. at 612. The court rejected the protestor's argument, stating the disclaimers in the distributed documents—that the event was for informational purposes only—"conveyed the very lack of explicit intent to be bound by the specifics of the communication[.]" *Id*. at 613.

The same is true of the RFI in this case. The disclaimer is the clearest expression of the Marine Corps' intent not to be bound to award a contract under the requirements described therein. AccelGov states that the Marine Corps began drafting a Justification and Approval document to support a sole-sourced small business set-aside award. (Pl.'s MJAR at 15). AccelGov believes that this document demonstrates that the Marine Corps was in fact seeking to issue an award based on the RFI requirements. (*Id*.). Whatever the Marine Corps' internal documents may show, those are not "publicly expressed" intentions of the government. By definition, they do not raise the interference of a publicly expressed intent contrary to what is encapsulated in the RFI.

Finally, the Court recognizes that it is no coincidence that the RFI refers to requirements that, in all ways meaningful, are identical to the Marine Corps' eventual sole-source award to United Support Services. (*Compare* AR 578–90 (RFI Performance Work Statement) *with* AR 714–18 (8(a) Performance Work Statement)). But that similarity in scope of work does not negate the very clear intent expressed in the RFI's disclaimer. The proper focus of the Court's inquiry is whether, when the sole-source award was issued, the Marine Corps expressed a prior clear intent to make a small business set-aside award. The RFI simply does not demonstrate that clear intent on its face.

In summary, the RFI does not demonstrate a publicly expressed clear intent to award the IT services bridge contract as a small business set-aside. Therefore, an 8(a) sole-source award was not precluded by 13 C.F.R. § 124.504(a).

*B. The SBA failed to perform an adverse impact analysis required by 13 C.F.R.
§124.504 and thus the Marine Corps' award decision lacks support in the
Administrative Record.*

AccelGov argues that the Marine Corps' 8(a) sole-source award was not a "new requirement," but rather a follow-on to the Incumbent Contract and the RFP. (Am. Compl. Count II; Pl.'s MJAR at 20). Consequently, AccelGov argues, the SBA was required to perform an adverse impact analysis but failed to do so. (*Id.*). Therefore, AccelGov's argument goes, the SBA's acceptance of the Marine Corps' requirements violated 13 C.F.R. § 124.504(c), and consequently, the Marine Corps' procurement decision lacks support in the Administrative Record. (*Id.*). The Court agrees that the requirements were not new, and the SBA failed to perform an adverse impact analysis required by 13 C.F.R. § 124.504. Consequently, because the Marine Corps relied on the SBA's endorsement to issue an 8(a) award, that award decision lacks support in the Administrative Record.

    i.   <u>The 8(a) Bridge Contract is not a "new requirement" thus, the SBA's failure
to perform an adverse impact analysis as required by 13 C.F.R § 124.504.</u>

To protect small business concerns outside of the 8(a) Program, the SBA is required to make a "written determination" as to whether "acceptance of the procurement for [an] 8(a) award would have an adverse impact on an individual small business, a group of small businesses located in a specific geographical location, or other small business programs." 13 C.F.R. § 124.504(c). But the SBA need not perform an adverse impact determination where a "new requirement" is offered to the 8(a) Program. § 124.504(c)(1)(ii)(D). "New requirement" is a term of art, and the regulations provide some guidance as to what requirements the SBA typically considers "new":

A new requirement is one which has not been previously procured by the relevant procuring activity.

(A) Where a requirement is new, no small business could have previously performed the requirement and, thus, SBA's acceptance of the requirement for the 8(a) BD program will not adversely impact any small business.

(B) Procurements for construction services (e.g., the building of a specific structure) are generally deemed to be new requirements. However, recurring indefinite delivery or indefinite quantity task or delivery order construction services are not considered new (e.g., a recurring procurement requiring all construction work at base X).

(C) The expansion or modification of an existing requirement may be considered a new requirement where the magnitude of change is significant enough to cause a price adjustment of at least 25 percent (adjusted for inflation) or to require significant additional or different types of capabilities or work.

Section 124.504(c)(1)(ii)(A)–(C). The third guideline encapsulates two considerations: (1) a twenty-five percent variance in value; and (2) "[w]hether the scope has changed significantly, requiring meaningful different types of work or different capabilities." 85 Fed. Reg. 66155.[5]

The United States does not contend that the SBA performed an adverse impact analysis. Nor has it tendered those documents, should they exist, for inclusion in the record. Instead, the United States urges the Court to focus on only the first part of the third guideline and find that this procurement represents a "new requirement" because the value of the awarded contract varies from the value of the Incumbent Contract and RFP by more than twenty-five percent. (USA xMJAR at 22). This argument is not compelling. In 2020, the SBA amended the regulation to ensure a twenty-five percent price variance would not be dispositive. *See* 85 Fed. Reg. 66188 ("Removing the word 'will' and adding in its place the word 'may' in paragraph (c)(1)(ii)(C)"). In fact, the SBA determined that the considerations "should be a guide, and not necessarily dispositive of whether a requirement qualifies as 'new.'" 85 Fed. 66155 (further explaining that applying the twenty-five percent rule rigidly could permit gamesmanship and circumvention). Finally, the 2020 revisions included the addition of 13 C.F.R. § 124.504(c)(4), stating:

> SBA does not typically consider the value of a bridge contract when determining whether an offered procurement is a new requirement. A bridge contract is meant to be a temporary stop-gap measure intended to ensure the continuation of service while an agency finalizes a long-term procurement approach.

*See* 85 Fed. Reg. 66188 ("Adding a paragraph (c)(4)" to 13 C.F.R. § 124.504).

AccelGov's argument is more compelling—the scope of work has not "changed significantly, requiring different types of work or different capabilities." 85 Fed. Reg. 66155 (explaining 13 C.F.R. § 124.504(c)(1)(ii)(C)). The RFP and the 8(a) bridge contract contain the same scope of work, albeit the 8(a) award is adjusted for the shorter duration. (*Compare* AR 36–85 (RFP Performance Work Statement) *with* AR 701–49 (Bridge Contract Performance Work Statement)). Table 1 in each Performance Work Statement contains "Tasks," "Subtasks," and "Task Output" columns. (AR 49, 714). Every task and nearly every subtask in these columns is identical across both Performance Work Statements. The bridge contract Performance Work Statements omits certain subtasks and outputs such as budgeting and researching emerging technologies, which are endemic to a long-term contract, but in all meaningful ways the performance work statements are identical. These similarities strongly support AccelGov's contention that, despite the variance in duration and scale, the bridge contract does not require "meaningful different types of work or different capabilities" than were required by the RFP. (Pl.'s Reply at 6, ECF No. 54). When confronted with these similarities during oral argument, the United States urged the Court to consider the "implied tasks" that fell under the deleted subtasks, suggesting there were more meaningful changes than meet the eye. (Tr. of Oral Arg. at

---

[5] The Federal Register also discusses a third consideration, contained in the definition of "[f]ollow-on requirement or contract." That third factor is "whether the end user of the requirement has changed." 13 C.F.R. § 124.3. The third factor is not implicated here.

15–16, ECF No. 58). However, the United States was unable to provide any support for that assertion in the Administrative Record. (*Id*. at 16–17).

The performance work statements were so similar that the Contracting Officer was able to use the RFP responses, in combination with the market research obtained using the RFI, to evaluate companies for the bridge contract. (AR 874–76). In fact, the award to United Support Services was based almost entirely on the company's response to the RFP. (AR 874–76). The Court agrees with AccelGov that the Marine Corps "cannot use the prior acquisition to evaluate [United Support Services] for the Bridge Contract doing the same work, and then claim that the requirement is new. That is not fair, not reasonable and not true." (Pl.'s MJAR at 21). Even the SBA recognized that the bridge contract did not fulfill "new" requirements, as it identified the bridge contract as a "follow-on" when corresponding with the Marine Corps. (AR 677, 1205).[6]

As AccelGov pointed out during oral argument, the record reflects no analysis or considered judgment from either the Marine Corps or the SBA regarding whether the requirements were "new." (Tr. of Oral Arg. at 22–24). At one point during the procurement process, the SBA's description of the bridge contract shifts. The SBA initially discussed the contract as a "follow-on," but later described the requirements as "new." (*Compare* AR 676–77 *with* AR 782–83). The record does not reveal any considered judgment in that shift, and the Court finds that the initial, contemporaneously-made descriptor is the most credible indication of the SBA's thinking. The lack of any legal analysis from the SBA on this issue is striking considering that the regulations at issue are SBA regulations and thus the SBA would likely be entitled to deference had it undertaken minimum interpretive efforts. *Auer v. Robbins*, 519 U.S. 452 (1997). Likewise, the Marine Corps never attempted its own analysis or reconciled the inconsistency in the SBA's characterization of the bridge contract.

In summary, the bridge contract awarded using an 8(a) sole-source award was not for "new requirements." The requirements were the same as those in the Incumbent Contract and the RFP, though slightly modified to account for a shorter performance period. Therefore, under 13 C.F.R. § 124.504(c), the SBA was required to perform an adverse impact analysis. It failed to do so. Consequently, the SBA's endorsement of United Support Services for an 8(a) award was erroneous.

ii.   <u>The Marine Corps' 8(a) award lacks support in the Administrative Record.</u>

As explained above, the SBA endorsed United Support Services for an 8(a) award in contravention of 13 C.F.R. § 124.504. The Marine Corps relied on the SBA's endorsement in

---

[6] As an aside, during oral argument, United Support Services raised a new argument—that SBA was not required to perform an adverse impact report if the contract was a "follow-on." (Tr. of Oral Arg. at 45). United Support Services cited 13 C.F.R. § 124.504(c), which states that an adverse impact report is not required if the requirement is a "follow-on or renewal *8(a) acquisition*[]." (emphasis added). However, the Incumbent Contract and award under the RFP were total small business set-asides. (AR 4). Section 124.504(c) contemplates multiple 8(a) acquisitions, not an 8(a) award as a follow-on to another type of acquisition. Subsection (c) simply does not control here.

determining that United Support Services was eligible for an 8(a) award of the bridge contract. (AR 771 (describing the rationale for the procurement approach)). Given that the SBA erroneously endorsed United Support Services, it follows that the Marine Corps' award decision lacked support in the Administrative Record. Though AccelGov urges the Court to set the award aside on this basis, AccelGov conceded that a remand would be an appropriate remedy. (Tr. of Oral Arg. at 43:11–22). Therefore, the Court remands this matter to the SBA to perform an adverse impact analysis as required by 13 C.F.R. § 124.504.

At oral argument, counsel for the United States was not joined by counsel from either the SBA or the Marine Corps. (Tr. of Oral Arg. at 24–25). The United States was unable to provide any estimated timeline for the SBA's completion of an adverse impact analysis, or what such an analysis would involve. (*Id*. at 25–27). Counsel for AccelGov represented having some experience with the SBA's timeline for an adverse impact analysis and suggested that one could be completed within a few weeks. (*Id*. at 36–37). The Court credits that representation as the only information in the record of an appropriate timeline for remand.

### C.   Neither the SBA's suitability analysis nor the Marine Corps' evaluation of RFP responses was arbitrary and capricious.

AccelGov argues that the SBA's analysis of United Support Services' suitability for the 8(a) award was arbitrary and capricious. (Am. Compl. Count III; Pl.'s MJAR at 22). AccelGov also argues that the Marine Corps' selective use of information from the RFP and RFI responses was likewise arbitrary and capricious. (*Id*.). Though AccelGov's brief somewhat blends these arguments, the Court views them as distinct challenges under the Court's highly limited APA jurisdiction.

#### i.   The SBA properly conducted a suitability analysis for United Support Services.

The 8(a) Program is an exception to CICA's general rule that procurements must be subject to full and open competition. 41 U.S.C. § 3301 (general rule); 10 U.S.C. § 2304(c)(5) (other than competitive procedures available when a statute specifically so authorizes); 15 U.S.C. § 637(a) (8(a) Program); 48 C.F.R. § 6.302-5(b)(4) (explaining that 8(a) awards are exempt from full and open competition). Selection for the 8(a) Program is a cooperative effort—"the SBA and an agency match the agency's requirements with the capabilities of 8(a) participants to establish a basis for the agency to contract with the SBA under the program." 48 C.F.R. § 19.803. There are three ways an acquisition is selected for the 8(a) Program: (1) the SBA contacts the contracting activity and advises that agency of the participant's capabilities and seeks agency requirements that meet those capabilities; (2) the SBA identifies a specific requirement for an 8(a) participant and sends a letter to the agency's small business procurement office requesting that the contracting officer offer the procurement to the 8(a) program; or (3) agencies "independently, or through the self marketing efforts of an 8(a) participant, identify a requirement for the 8(a) program" and then offer that requirement to the SBA either "on behalf of a specific 8(a) participant, for the 8(a) program in general, or for 8(a) competition." § 19.803(a)–(c).

In this case, the requirements for the bridge contract were identified by the SBA, which then requested that the Marine Corp reserve the procurement for the 8(a) Program and, specifically, for an award to United Support Services. (AR 676, 699). Therefore, this procurement falls within § 19.803(b). Consequently, the SBA was required to provide the Marine Corps with certain information listed in § 19.803(a) and (b). Within subsection (b), because this was a sole-source request, the SBA was required to provide the Marine Corp with:

> (A) The reasons why the participant is considered suitable for this particular acquisition; e.g., previous contracts for the same or similar supply or service; and

> (B) A statement that the participant is eligible in terms of its small business size status relative to the assigned NAICS code, business support levels, and business activity targets[.]

48 C.F.R. § 19.803(b)(4)(i)(A)–(B). 48 C.F.R. § 19.804-1 details the criteria on which *the Marine Corps* was required to evaluate the suitability of a participant:

> In determining the extent to which a requirement should be offered in support of the 8(a) program, the agency should evaluate—

> (a) Current and future plans to acquire the specific items or work that 8(a) participants are seeking to provide, . . .

> . . .

> (b) The impact of any delay in delivery;

> (c) Whether the items or work have previously been acquired using small business set-asides, and the date the items or work were acquired;

> (d) Problems encountered in previous acquisitions of the items or work from the 8(a) participants or other contractors; and

> (e) Any other pertinent information about known 8(a) participants, the items, or the work.

48 C.F.R. § 19.804-1. There is no requirement that the SBA or Marine Corps compare AccelGov and United Support Services. All that is required is that the SBA determined United Support Services to be "suitable" and "eligible," and that the Marine Corps evaluated United Support Services on the criteria found in § 19.804-1.

Here, the record demonstrates that those agencies complied with the requirements. First, the SBA sent the Marine Corps a Search Letter and Firm's Capability Statement on behalf of United Support Services for the bridge contract. (AR 676–78). The Marine Corps Contracting Officer then drafted a memorandum to the file stating that the Marine Corps had "conducted a thorough review and evaluation of [United Support Services'] capabilities under [the RFP] during which the Government found their technical proposal acceptable and their proposed price

fair and reasonable." (AR 770–72). The Marine Corps' Contracting Officer concluded that United Support Services was capable of performing at a reasonable price and therefore issued the 8(a) sole-source award. (AR 771). The Marine Corps and the SBA did not act irrationally, arbitrarily or capriciously, or contrary to law in this regard. 22nd Century's capabilities, including its apparent advantages it brought to the AccelGov joint venture, are irrelevant here.

  ii. The Marine Corps' use of RFP and RFI responses in making the 8(a) award was not arbitrary and capricious.

As discussed above, AccelGov appears to take issue with the Marine Corps amalgamating information the parties submitted in response to the RFP and RFI to conduct evaluations on what the United States now argues is a "new" procurement. (Pl.'s MJAR at 23). Indeed, the 8(a) determination letter addendum draws on both the RFP and RFI responses. (AR 874–77). For example, the Marine Corps cited its acceptance of both the price and non-price factors in United Support Services' proposal in response to the RFP, *and* United Support Services' ability to begin performance within five days—a response to the RFI. (AR 876). For AccelGov, the Marine Corps was only able to evaluate the RFI response, because AccelGov did not submit a proposal in response to the RFP. (AR 875). From that response, the Marine Corps concluded that it lacked enough information about AccelGov to determine whether it would be technically acceptable for an award. (AR 875). The Marine Corps also claimed that the teaming arrangement involving 22nd Century was unclear. (AR 875). However, 22nd Century—the incumbent contractor—submitted an RFI response and, through a teaming arrangement with FreeAlliance, submitted an RFP response. (AR 640, 478). Likewise, FreeAlliance submitted an RFI response. (AR 686).

In its 8(a) determination memorandum, the Marine Corps discussed the accounting systems of each 8(a) company that responded to the RFI even though it did not request that information in the RFI. (AR 875). United Support Services noted in its RFI response that it utilized a DCAA approved accounting system. (AR 671). United Support Services also provided that information in response to the RFP. (AR 876). AccelGov made no representations regarding its accounting system in its RFI response. (AR 646–49). The Marine Corps Contracting Officer noted that AccelGov had failed to "address whether it has an approved accounting system, which is a requirement for a cost reimbursement contract." (AR 875). That, combined with the "uncertainty regarding the teaming arrangement with 22nd Century Technologies" apparently prevented the Marine Corps from determining whether AccelGov could perform a cost reimbursement contract. (*See id.*).

The Marine Corps' treatment of AccelGov's interest in the bridge contract is somewhat perplexing. The RFI responses from AccelGov, 22nd Century, and FreeAlliance were identical. AccelGov provided that 22nd Century would perform as a mentor in the joint venture. (AR 646). AccelGov also explained that the joint venture, if selected, would utilize 22nd Century personnel—the incumbent personnel—which it identified by name. (AR 646–49). From the record, it is not clear what, exactly, the Marine Corps was "uncertain[]" about. In sum, it is curious why the Marine Corps believed it did not have sufficient information to evaluate

AccelGov—a joint venture that included a highly rated[7] incumbent contractor—yet was able to locate plenty of information to support an award to United Support Services, a relative newcomer. AccelGov's incredulity is understandable.

Nevertheless, "[e]ffective contracting demands broad discretion." *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958 (Fed. Cir. 1993). "The arbitrary and capricious standard applicable [in bid protest cases] is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). Procuring agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." *Tidewater Mgmt. Servs., Inc. v. United States*, 573 F.2d 65, 73 (Ct. Cl. 1978). This discretion extends to contracting officers; the Court must afford contracting officers substantial leeway to make decisions on "a broad range of issues confronting them in the procurement process." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotations omitted).

In giving due regard to the deference owed to agency decision-making in the procurement process, the Court may not set aside an administrative decision "simply because the court is unhappy with the result reached." *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). "Under the 'arbitrary and capricious' standard[,] the scope of review is a narrow one. A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment" and may not substitute its own judgment for that of the agency. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974) (internal quotations omitted). But the agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

Here, the record demonstrates that the Marine Corps' award to United Support Services was not an arbitrary, capricious, or irrational decision. Despite AccelGov's urging, the Court cannot review the procurement decision anew, it can only review whether the Marine Corps articulated a rational reason for selecting United Support Services for the bridge contract. The Marine Corps has done so here. The Marine Corps Contracting Officer stated that the sole-source contract was awarded based on the Marine Corps' review of three factors, whether: (1) companies had "the technical capabilities to execute the requirement immediately;" (2) companies utilize an accounting system "approved for a cost reimbursable contract" paired with "fair and reasonable" pricing; and (3) "[t]he 8(a) company is a responsible Offeror in accordance with [48 C.F.R. § 19.800 *et seq.*]." (AR 874). The Marine Corps determined that United Support Services was able to perform within five days of an award. (AR 876). It determined that United Support Services had demonstrated that it was acceptable on both price and nonprice factors under the RFP, which the Court has already explained was substantially similar in scope to the bridge contract award. (AR 876). And the Marine Corps determined that United Support

---

[7] Nearly all of 22nd Century's latest CPARS ("Contractor Performance Assessment Reporting System") ratings were "███████" save for cost control which was "███████" (Am. Compl. Ex. A at A13).

Services was a qualifying small business, eligible for an 8(a) award. (AR 770–72). These determinations were not irrational, arbitrary, or capricious based on the Administrative Record.

That 22nd Century or AccelGov might have been *more* capable or a *better* selection is irrelevant to the Court's judicial review here; those decisions are soundly within the agency's purview. The Marine Corps clearly reviewed the RFI responses, the RFP responses, and the SBA's proffer of United Support Services. The Marine Corps is entitled to discretion in weighing the information it possessed from those documents, so long as it can demonstrate that it reviewed and considered them and reached a decision rationally connected to the information gleaned. The Marine Corps has done so. Consequently, the Court cannot find that the Marine Corps acted irrationally, arbitrarily, or capriciously in awarding the bridge contract to United Support Services.

### D. Injunctive Relief

A party seeking an injunction must demonstrate (1) success on the merits; (2) irreparable harm absent an injunction; (3) the balance of hardships favors an injunction; and (4) that an injunction is in the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004). Though no single factor is dispositive, "proving success on the merits is a necessary element for a permanent injunction[.]" *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018). The trial court's decision to grant or deny an injunction is reviewed for abuse of discretion. *Asociacion Colombiana de Exportadores de Flores v. United States*, 916 F.2d 1571, 1578 (Fed. Cir. 1990). AccelGov has not demonstrated success on the merits with respect to Counts I and III of its Amended Complaint. Therefore, AccelGov is not entitled to injunctive relief on those grounds. The Court reserves judgment with respect to Count II. After remand, AccelGov may reraise arguments with respect to Count II if that claim is not moot.

### III.   Conclusion

As explained above, the Court finds that the clear language of the RFI does not express publicly a clear intent to conduct a procurement. The Court also finds that the bridge contract was not a "new requirement," therefore the SBA was required to perform an adverse impact analysis. The Court remands Count II to the SBA to perform that analysis. Finally, the Court finds that the Marine Corps is entitled to discretion in the procurement process, and its selection of United Support Services was not irrational, arbitrary, or capricious.

Accordingly, the Court **ORDERS** the following:

(1) AccelGov, LLC's Motion for Judgment on the Administrative Record, ECF No. 47, is **DENIED** with respect to Counts I and III.

(2) United Support Services, Inc.'s Cross-Motion for Judgment on the Administrative Record, ECF No. 49, is **GRANTED** with respect to Counts I and III.

(3) The United States' Cross-Motion for Judgment on the Administrative Record, ECF No. 51, is **GRANTED** with respect to Counts I and III.

(4) Under RCFC 54(b), there being no just reason for delay, the Clerk is **DIRECTED** to enter judgment for the United States and United Support Services, Inc. on Counts I and III of AccelGov's Complaint.

(5) The Court **DEFERS** judgment on Count II.

(6) Under RCFC 52.2, Count II is **REMANDED** to the Small Business Administrative for a period not to exceed thirty days.

(7) On remand, the Small Business Administration is **ORDERED** to conduct an adverse impact report consistent with 13 C.F.R. § 124.504.

(8) On or before November 1, 2021, the United States is **ORDERED** to file a status report detailing the results of a remand. If the adverse impact report is not complete within 30 days, the United States is **ORDERED** to file a notice showing cause why the Court should not enter judgment and grant relief in favor of AccelGov.

(9) After being notified of the results of the remand, the Court will schedule a status conference to discuss further proceedings in this matter.

(10)      On or before October 14, 2021, the United States is **ORDERED** to file a Notice that contains a statement indicating whether the parties seek redactions to the public version of this Opinion. That Notice must represent whether the United States has discussed the matter with all counsel and the extent of agreement as to the redacted content. The proposed redactions must be reflected in a PDF attached as an exhibit to that Notice.

**IT IS SO ORDERED.**



s/      David A. Tapp____
DAVID A. TAPP, Judge